163 F.3d 366
 PERFORMANCE CONTRACTING, INC., Plaintiff-Appellant,
v.
SEABOARD SURETY COMPANY; St. Paul Fire and Marine Insurance
Company; University Mechanical and Engineering
Contractors, Inc., d/b/a JWP Mechanical
Services; Emcor Group, Inc.,
Defendants-Appellees.
 No. 97-2142.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 27, 1998.
Decided Dec. 16, 1998.
 
 Ronald J. Garber (argued and briefed), Shapiro, Fussell, Wedge, Smotherman & Martin, LLP, Atlanta, GA, Kevin M. O'Connell, Novi, MI, for Plaintiff-Appellant.
 E. Peter Drolet (briefed), Drolet, Freeman, Cotton & Norris, Bloomfield Hills, MI, Michael Loulakis (argued), Wickwire & Gavin, Vienna, VA, for Defendants-Appellees.
 Before: BOGGS, SUHRHEINRICH, and SILER, Circuit Judges.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 Performance Contracting, Inc. appeals the dismissal of its contract action without prejudice. The court below ruled that Performance Contracting's subcontract with JWP Mechanical Services required the company to exhaust administrative remedies by certifying to the Contracting Officer of the United States Department of Veterans Affairs any unresolved claims it had related to a construction project. Based on a straightforward reading of the contract, we find no such requirement and reverse and remand for further proceedings.
 
 
 2
 * This action arose out of the construction contract to build the 500-bed Veterans Affairs Medical Center (hereinafter "VA Hospital") in Detroit, Michigan. The VA Hospital construction contract is the largest single contract ever issued by the United States Department of Veterans Affairs ("VA").
 
 
 3
 In December 1991, the VA entered into a construction contract (hereinafter "Prime Contract") with Bateson-Dailey ("B-D") for approximately $230,000,000 to construct the VA Hospital and to do related work in the Detroit area. The dispute resolution clause of this contract required B-D to submit all claims arising under or related to the Prime Contract to the Contracting Officer of the VA for a written decision before bringing suit, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (1998).
 
 
 4
 On January 22, 1992, B-D subcontracted the mechanical work at the site to defendant-appellee JWP Mechanical Services ("JWP") for approximately $55,000,000 (hereinafter "JWP Subcontract"). This subcontract read, in pertinent part:
 
 
 5
 1. GENERAL SCOPE.... The Subcontractor, as to this subcontract work, is bound to the Contractor by the terms and requirements of the above referred to Contract Documents and assumes toward the Contractor all the obligations and responsibilities that the Contractor, by those documents, assumes towards the Owner, and the Subcontractor shall have all the benefits of the obligations and responsibilities that the Owner, by those documents, assumes toward the Contractor....
 
 
 6
 ....
 
 
 7
 9. DISPUTES.
 
 
 8
 (a) If any controversy ... shall arise between the Contractor and the Subcontractor as to interpretation of the requirements of this subcontract, ... the Subcontractor shall proceed so as to not delay the work and shall file with the Contractor within twenty-one (21) days ... its written itemized estimate for the cost of performing the disputed work.... If the parties hereto are unable to resolve the controversy, each shall retain its full legal rights.
 
 
 9
 (b) If the Subcontractor makes a claim in connection with changes ordered by the Owner or any dispute arising out of the Owner's or its authorized representative's interpretation of the Contract Documents or any dispute arising out of inaccuracies, deficiencies, discrepancies or ambiguities in the plans and specifications, the Subcontractor shall proceed in accordance with the administrative remedies provided for in the Contract Documents and shall exhaust its administrative remedies thereunder prior to commencing any legal action in connection therewith.
 
 
 10
 On April 24, 1992, JWP subcontracted the insulation work at the hospital to plaintiff-appellant Performance Contracting, Inc. ("PCI") for approximately $3,100,000 (hereinafter "PCI Subcontract"). This subcontract read, in pertinent part:
 
 
 11
 1. General Scope. The Subcontractor shall furnish for the contract price set forth hereafter all plant, labor, material and equipment required to perform the work described herein in accordance with the contract between the Owner and the General Contractor as well as the contract between the General Contractor and the Mechanical Contractor. The Subcontractor assumes toward the Mechanical Contractor all of the obligations and responsibilities that the Mechanical Contractor has assumed toward the General Contractor and the Owner.
 
 
 12
 ....
 
 
 13
 9. Disputes. If any controversy or dispute shall arise between the Mechanical Contractor and the Subcontractor as to the interpretation of the requirements of this Subcontract, such dispute shall not be an excuse for the Subcontractor to delay the work. The Subcontractor shall proceed with the work and file with the Mechanical Contractor within ten (10) days of the notice of such dispute, any claim by the Subcontractor arising out of such dispute. The Mechanical Contractor and the Subcontractor shall attempt to resolve the dispute. If the parties are unable to resolve the controversy, each shall retain its full legal rights.
 
 
 14
 The PCI Subcontract did not have a clause similar to JWP Subcontract clause 9(b) that would require PCI to proceed in accordance with the administrative remedies provided for in the Prime Contract.
 
 
 15
 In November 1995, PCI met with JWP to complain that JWP, B-D, and the VA were directly responsible to PCI for damages caused by actions that increased its construction costs by more than $2,000,000. The VA Hospital was substantially completed in May 1996, ten months after the original date required under the contract documents. In June 1996, PCI submitted claims to JWP alleging increased costs totaling in excess of $3,000,000. PCI met several additional times with representatives of JWP in an attempt to resolve its claims, but the meetings were not fruitful.
 
 
 16
 In March 1997, PCI filed this suit against defendant-appellees alleging breach of contract, breach of express and implied duties, and unjust enrichment. PCI also requested payment pursuant to a payment bond issued to JWP that promised to indemnify any claimants under the JWP Subcontract for damages caused by B-D or the VA. Two of the other named defendants in the suit, Seaboard Surety Company and St. Paul Fire and Marine Insurance Company, are the bonding companies that issued the payment bond. The other defendant-appellee, EMCOR Group, Inc., is a holding company and a shareholder in several companies, including JWP.
 
 
 17
 On April 28, 1997, appellees filed a Motion to Dismiss or in the Alternative to Stay Proceedings. Attached to this motion was an affidavit by B-D's Project Director stating that most or all of the claims PCI submitted to JWP in February 1997 were "potentially attributable to the VA." The affidavit also stated that "Bateson-Dailey will submit an omnibus Claim to the VA that will include a claim from JWP which, in turn, will include PCI's claim to JWP as it has been presented."[1]
 
 
 18
 The trial court granted appellees' motion, ruling that the PCI "subcontract mandates that [PCI] exhaust the contractual remedies for claims against the VA before bringing suit against JWP." The court rejected PCI's argument that the remedy before the VA "is futile because its claims against JWP and B-D will be left unresolved" on the ground that "[a]ny determination of futility by this Court before [the claim is presented to the VA] is speculative." PCI now appeals.
 
 II
 
 19
 We review de novo a district court's dismissal of a complaint under FED .R. CIV. P. 12(b)(6).[2] Taxpayers United for Assessment Cuts v. Austin, 994 F.2d 291, 296 (6th Cir.1993). We must read all well-pleaded allegations of the complaint as true. Bower v. Federal Express Corp., 96 F.3d 200, 203 (6th Cir.1996). "Our review is essentially the same as the district court's; we 'take the plaintiff's factual allegations as true and if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief, then ... dismissal is proper.' " Forest v. United States Postal Serv., 97 F.3d 137, 139 (6th Cir.1996) (quoting American Eagle Credit Corp. v. Gaskins, 920 F.2d 352, 353 (6th Cir.1990)). A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. Allard v. Weitzman (In re DeLorean Motor Co.), 991 F.2d 1236, 1240 (6th Cir.1993).[3]
 
 
 20
 Appellees believe that we should consider the question of whether PCI is contractually obligated to resolve its claims administratively by evaluating and applying the jurisprudence that has arisen under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (1998). The Act requires that all disputes arising under a contract entered into by an executive agency for "the procurement of construction, alteration, repair or maintenance of real property" first be resolved by the executive agency's contracting officer. 41 U.S.C. §§ 602, 605 (1998).
 
 
 21
 We disagree. The Act only requires that contracts "entered into by an executive agency " be brought before a contracting officer. 41 U.S.C. § 602 (1998) (emphasis added). On their face, PCI's claims are being brought against private entities pursuant to a contract (the PCI Subcontract) to which the government is not a party. Thus, before we examine the impact the Contact Disputes Act might have on this case, we must first consider whether PCI is required by the PCI Subcontract to arbitrate its claims before the VA. If none of the obligations to exhaust administrative remedies in the Prime Contract or the JWP Subcontract are applicable to PCI under established rules of contract interpretation, the Contract Disputes Act is irrelevant.
 
 
 22
 Clause 9 ("Disputes") of the PCI Subcontract provides: "The Mechanical Contractor and the Subcontractor shall attempt to resolve the dispute. If the parties are unable to resolve the controversy, each shall retain its full legal rights." Clause 1 ("General Scope") of the subcontract states: "The Subcontractor assumes toward the Mechanical Contractor all of the obligations and responsibilities that the Mechanical Contractor has assumed toward the General Contractor and the Owner." PCI argues that if it was required to first undertake administrative remedies pursuant to clause 1, clause 9 would be rendered meaningless because PCI would no longer retain "full legal rights." PCI argues that its rights would then "become only those limited rights it has as a sub-contractor in the administrative process." Appellees argue that PCI, by assuming towards JWP in clause 1 of the PCI Subcontract "all of the obligations and responsibilities" that JWP has assumed towards B-D and the VA, is obligated to first exhaust administrative remedies before the VA.
 
 
 23
 We believe that the correct interpretation of the PCI Subcontract does not require the exhaustion of administrative remedies before the VA. The PCI Subcontract, though similar in form to the JWP Subcontract, does not include the specific language in the JWP Subcontract that requires the exhaustion of administrative remedies. Each subcontract has a "General Scope" clause (clause 1 in both subcontracts) in which one party agrees to assume all of "the obligations and responsibilities" that have been assumed by the other. Each subcontract also has a separate "Disputes" clause (clause 9(a) in the JWP Subcontract, clause 9 in the PCI Subcontract) in which the parties agree to attempt to settle disputes on their own and, should that fail, each party would "retain its full legal rights."
 
 
 24
 However, the JWP Subcontract has a specific clause 9(b), which explicitly requires the exhaustion of administrative remedies before the VA. There is no clause 9(b) in the PCI Subcontract, nor any other clause, that requires such exhaustion. If JWP wanted to require PCI to exhaust remedies before the VA, it could easily have included language in the PCI Subcontract similar to that in clause 9(b) of the JWP Subcontract (a writing from which the PCI Subcontract appears to have been largely derived).
 
 
 25
 Under Michigan law, "[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." McIntosh v. Groomes, 227 Mich. 215, 198 N.W. 954, 955 (Mich.1924). Therefore, the failure to include the Clause 9(b) language in the PCI Subcontract strongly suggests that the "obligations and responsibilities" language in Clause 1 of the PCI Subcontract was not intended to cover the exhaustion of administrative remedies before the VA. If Clause 1 is enough to require exhaustion by incorporating applicable language from the Prime Contract, why would JWP have included clause 9(b) in the JWP Subcontract, but omit such a clause in the PCI Subcontract?
 
 
 26
 Moreover, the Supreme Court has made it clear that "the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language." United States v. Moorman, 338 U.S. 457, 462, 70 S.Ct. 288, 94 L.Ed. 256 (1950). Even if the "obligations and responsibilities" in clause 1 of the PCI Subcontract could properly be interpreted so as to require exhaustion, it is obvious that the subcontract does not require exhaustion using "plain language." The fact that JWP had a clear opportunity to add such "plain language" to the PCI Subcontract, but failed to do so, seems fatal to any argument that the "obligations and responsibilities" was intended to cover exhaustion.
 
 
 27
 Our interpretation of the PCI Subcontract is consistent with the requirement that, under Michigan law, any imperfection or ambiguity in a contract must be construed most strongly against the drafter. See, e.g., Tweddle v. Tweddle Litho Co., 80 Mich.App. 418, 264 N.W.2d 9, 12 (Mich.App.1978); Stark v. Kent Products, Inc., 62 Mich.App. 546, 233 N.W.2d 643, 644 (1975); see also Hanley v. Porter, 238 Mich. 617, 214 N.W. 179, 180 (1927). JWP appears to have drafted this contract: the contract is on JWP letterhead, and JWP does not dispute PCI's claim that JWP was the drafter.
 
 
 28
 Even assuming arguendo that the PCI Subcontract requires PCI to first exhaust administrative remedies before the VA, it is highly doubtful that PCI could bring its claims before a contracting officer. A subcontractor may assert a claim against the government under the Contract Disputes Act only by having the prime contractor "sponsor" and certify the subcontractor's claim, see NavCom Defense Electronics, Inc. v. Ball Corp., 92 F.3d 877, 879-80 (9th Cir.1996), and, as a practical matter, prime contractors often do allow subcontractors to prosecute claims in the prime's name when they perceive that the subcontractors really have more at stake in a claim and are therefore willing to work harder on its enforcement. Erickson Air Crane Co. of Washington, Inc. v. United States, 731 F.2d 810, 813 (Fed.Cir.1984).
 
 
 29
 However, it is a well-established proposition that a contracting officer has no jurisdiction to resolve disputes between a general contractor and a subcontractor. See, e.g., NavCom, 92 F.3d at 880; U.S. West Communications Services v. United States, 940 F.2d 622, 627 (Fed.Cir.1991). Although it remains an open question to what extent the basis for a claim must be attributable to the government before a contracting officer can assert jurisdiction,[4] we need not resolve this question today: PCI's claims, on their face, are not against the government, and the trial court made no finding whatsoever that these claims were somehow attributable to the VA. The only evidence in the record suggesting that PCI's claims are attributable to the government is an affidavit by B-D's Project Director that states that "most or all" of the claims made by PCI submitted to JWP in February 1997 were "potentially attributable to the VA." Needless to say, this one affidavit, submitted by defendant-appellees, does not conclusively establish that PCI would be entitled to bring its claims before the Contracting Officer of the VA.
 
 III
 
 30
 For the foregoing reasons, we REVERSE the district court's order dismissing PCI's complaint without prejudice and REMAND the case for further proceedings consistent with this opinion.
 
 
 
 [1]
 At oral argument, counsel for appellees indicated that submission of this claim to the VA was impending
 
 
 [2]
 It is unclear whether the district court relied on affidavits attached to appellee's 12(b)(6) motion in ruling on the motion. If so, it would have had to construe the motion as a Rule 56 motion for summary judgment. "According to Rule 12(b) of the Federal Rules of Civil Procedure, once 'matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....' " Barrett v. Harrington, 130 F.3d 246, 253 (6th Cir.1997). However, since a grant of summary judgment would necessitate that the claims be dismissed with prejudice, it seems that the motion was properly considered a 12(b)(6) motion
 
 
 [3]
 Appellee argues that our standard of review should be "abuse of discretion," on the ground that several panels in our circuit have used such a standard in cases where the trial court dismissed claims on the ground that administrative remedies had not been exhausted. These cases are inapplicable, for we are evaluating whether such remedies must be exhausted under the contract (a question of law), not if they have been (a question of fact)
 
 
 [4]
 Few courts have answered this question, and the ones that have done so have provided varying answers. The court in S&M Constructors, Inc. v. Foley Co., No. 92-0142-CV-W-6, 1992 WL 37515 (W.D.Mo. Feb 21, 1992), aff'd, 959 F.2d 97 (8th Cir.1992), cert. denied, 506 U.S. 863, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992), seemed to utilize a "directly affect the government" test when it stated: "While it has been construed to affect disputes between subcontractors and the Government, the present arbitration does not, as described, directly affect the Government...." Id. at * 1. The Ninth Circuit suggested in NavCom that the subcontractor must either (1) challenge government conduct or (2) suggest that the government was responsible for increased costs. See NavCom, 92 F.3d at 880. However, the court in United States v. Gust K. Newberg Const. Co./F. H. Paschen Group, No. 93-C-5219, 1995 WL 263415 (N.D.Ill., May 2, 1995), implied that the government must be a party to the dispute before a claim can be brought before a contracting officer. Id. at * 2 ("However, the Act does not provide for administrative resolution of disputes in which the government is not a party.")